UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Lori A. Calhoun,                                        Civil No. 04-4398 (PAM/FLN)

                    Plaintiff,

        v.                                              **REPORT AND RECOMMENDATION**

Jo Anne B. Barnhart,
Commissioner of Social Security,

                    Defendant.
_____

Michael Cuzzo, for Plaintiff.
Lonnie F. Bryan, Assistant United States Attorney, for Defendant.
_____

        Plaintiff Lori A. Calhoun seeks judicial review of the final decision of the Commissioner of

Social Security, who denied her application for period of disability and disability insurance benefits.

See 42 U.S.C. §§ 416(i) and 423.   The matter was referred to the undersigned for Report and

Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.   This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g) .   The parties have submitted cross-motions for summary judgment

[#8 and #11].   For the reasons that follow, this Court recommends that the Commissioner's decision

be affirmed.

## I.  INTRODUCTION

        Plaintiff Lori A. Calhoun applied for disability insurance benefits ("DIB") on May 30, 2002,

alleging an onset date of disability of March 30, 2002.  (T. 131-33).  Plaintiff alleged she was

impaired by scoliosis, bipolar disorder, anxiety disorder, and arthritis of the hands. (T. 381-83). The

Social Security Administration denied the application initially and upon reconsideration.  (T. 98-

101, 384-86).   Plaintiff timely filed a request for a hearing, which was held before the Administrative Law Judge ("ALJ") Paul D. Tierney on February 9, 2004.  (T. 28).  The ALJ rendered an unfavorable opinion on April 26, 2004.  The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a range of medium work with some limitation, and therefore she was not disabled under the Social Security Act.  (T. 17-27).  Plaintiff appealed the unfavorable decision to the Appeals Council, which denied review, making the ALJ's decision the final decision of the Commissioner.  (T. 9-11).

Plaintiff initiated this action in federal court seeking judicial review on October 12, 2004. [#1].  Plaintiff moved for summary judgment on February 15, 2005 [#8].  She raised the following issues in her motion: 1) whether the ALJ improperly rejected the opinions of the her treating psychologist; 2) whether the ALJ gave inappropriate weight to the medical examiner's testimony; and 3) whether the ALJ erred in failing to appropriately address Plaintiff's non-exertional impairments.

## II.  STATEMENT OF FACTS

### A.      Background

Plaintiff was born in 1960 and was age 43 at the time of the administrative hearing.  (T. 32). She attended high school through age 16 and later obtained a GED.  She worked in the past as a personal care attendant, beverage server, baby sitter and light assembly worker.  (T. 35-39; 200, 213).  Plaintiff worked most recently as a personal care attendant in her own home, but was unable to continue the position as of March 2002 because she lost the assistance of her boyfriend.  (T. 35-39).  At the time of the administrative hearing, she was unmarried, raising three teenage children, and was approximately five months pregnant.  (T. 33, 43, 335).

**B.**     **Medical Evidence**

**1.**     **Mental Health Treatment**[1]

The record shows that Plaintiff has received treatment for psychiatric conditions of bi-polar disorder, anxiety disorder with agoraphobia, and panic attacks.  (T. 247).  She has principally received treatment from three sources: psychiatrist Margaret Saracino, psychologist Gary Anderson, and a physician at Gateway Family Health Center.[2]

Plaintiff saw Dr. Saracino three times beginning on July 22, 1999.  (T. 236).  Dr. Saracino diagnosed bipolar disorder and prescribed Zyprexa, Klonopin, and Depakote.  (T. 233-36).  In January and March 2000, Dr. Saracino noted that Plaintiff had failed to show for her scheduled appointments.  She also noted receiving a message from Dr. Anderson that Plaintiff had not been taking her medications.  (T. 248).  On May 12, 2000, Dr. Saracino wrote to Plaintiff stating that Plaintiff had missed her medication appointment that day and that she was uncertain if Plaintiff was taking her medications because of a previous phone call in which Plaintiff indicated that some of her medications caused gastrointestinal side effects.  (T. 239).

Plaintiff saw Dr. Saracino again on January 18, 2001.  (T. 237).  Dr. Saracino noted that she had not previously treated her in person since November 4, 1999.  Plaintiff did not show for any subsequent appointments, and Dr. Saracino refused to prescribe further medication until Plaintiff appeared in person for an examination.  (T. 230-236).

The record shows that Dr. Anderson treated Plaintiff intermittently from 1999 to 2002.  (T. 241-249).  Dr. Anderson diagnosed Plaintiff as suffering from an anxiety disorder with agoraphobia.

---

[1]

Plaintiff does not dispute the ALJ's findings with respect to her alleged physical impairments.

[2]

The physician at the Gateway Family Health Clinic is not named in the record.

(T. 243-44; 247).  On January 27, 2000, Dr. Anderson noted that Plaintiff was returning to therapy after a two-month absence.  (T. 247).  Plaintiff reported paranoid and catastrophic thinking, and periods of high and low energy.  She also reported that she was having marital problems and difficulties with her two stepchildren.  (T. 247).

On February 10, 2000, Plaintiff reported to Dr. Anderson that she was "a little better."  (T. 244).  She said she was going forward with her divorce and that her son was receiving counseling. Dr. Anderson noted that Plaintiff's sleep pattern had improved, she was maintaining a connection with county social services, and that her relationship with her children had improved.  Plaintiff reported that she was taking Lithium and Klonopin, as prescribed.  Dr. Anderson told her that she may have bipolar disorder for life, but that it was "reasonable to think her symptoms would recede with proper management and personal care."  Plaintiff stated that she resisted filing for disability because she wanted to secure employment and care for her children. (T. 244).  Plaintiff reported that she would return to therapy on a weekly basis and that she would regularly meet with Dr. Saracino for medicine checks.  (T. 245).

On February 24, 2000, Dr. Anderson noted that Plaintiff appeared quite distressed and upset at the counseling session.  Plaintiff reported that her husband had obtained an order for protection against her and that the police had removed her and her children from her home and placed the children in temporary foster care.  Dr. Anderson noted that they spent the session trying to help Plaintiff with her immediate needs.  He asked her to contact Dr. Saracino and continue to take her medications.  (T. 243).

The record shows that Plaintiff did not see Dr. Anderson from March 2000 until August 2, 2001, when Plaintiff returned to reestablish a counseling relationship.  (T. 279-83).  At that time,

she was working as an in-home personal care attendant, and operating a small horse farm.  (T. 280).

She reported having mood swings, lashing out at her family, being reclusive, and being unable to

sleep, eat or concentrate.  She indicated she was taking no medications.  (T. 279).  Dr. Anderson

observed that Plaintiff was physically agitated and avoided eye contact, but that she was candid and

cooperative.  He noted that her thoughts were clear connected and logical, her memory and insight

were good, and that her intellectual functioning was excellent.  (T. 282-83).  He gave her a 62 on

the Global Assessment of Functioning ("GAF") scale, indicating mild symptoms.[3]  (T. 283).

On August 8, 2001, Plaintiff reported to Dr. Anderson that she suffered cyclical mood swings

that ranged from paranoia, anger and sadness.  (T. 278).  She reported that she was not currently

taking any medications.  Dr. Anderson urged Plaintiff to see Dr. Saracino and stressed to her the

need for consistent psychiatric care.  (T. 278).

Plaintiff saw Dr. Anderson again on August 23 and August 30, 2001.  (T. 276-77).  Dr.

Anderson encouraged Plaintiff to file for disability and helped her prepare her application.  On

September 6, 2001, Dr. Anderson noted that Plaintiff appeared fairly comfortable and seemed to be

relieved from some of her anxiety.  (T. 275).  Plaintiff reported that her new boyfriend had moved

in with her.  Dr. Anderson recommended she continue her medications and pursue an application

for disability benefits.  (T. 275).  On October 4, 2001, Dr. Anderson noted that Plaintiff was having

increased anxiety, difficulty keeping her thoughts focused, and tended to be negative and self-

defeating.  He recommended she concentrate on productive tasks and focus on anxiety management.

---

[3]

The GAF scale reports a clinician's judgment of an individual's overall level of functioning, and is used in planning, measuring the impact, and predicting the outcome of treatment.  Diagnostic and Statistical Manual of Mental Disorders 30-32 (4th Ed. 1997) ("DSM IV").  GAF scores from 41-50 indicate serious symptoms; scores from 51-60 indicate moderate symptoms, and scores from 61-70 indicate some mild symptoms.  Id.

(T. 274).  Plaintiff did not seek further treatment from Dr. Anderson between October 2001 and May 2002.  (T. 284).

On May 7, 2002, Plaintiff reported to her physician at the Gateway Family Health Clinic that she was not taking any medications.  She reported, however, that she had previously been treated with Lithium, Ativan, Xanax, Paxil, Wellbutrin, and an anti-psychotic.  She reported that the Lithium stabilized her mood, but also caused bloating and tremor.  She stated that Benzodiazepines helped her social phobia and agitation.  (T. 264).  The physician prescribed Depakote, Clonazepam, and Olanzapine.  (T. 263).  Her prescriptions were adjusted on May 15, 2002.  (T. 262).

On May 16, 2002, Plaintiff told Dr. Anderson that she had seen a new doctor.  (T. 273).  She reported that she had renewed her prescriptions and that she was willing to work with her medications.  Dr. Anderson observed that she appeared more settled and guardedly optimistic.  (T. 273).

On September 6, 2002, Plaintiff reported increased depression and crying.  (T. 258).  The physician increased her prescription for Zyprexa.  (T. 258).  On September 25, 2002, her physician reported that Plaintiff "had come down from her manic phase nicely," and that her paranoid thoughts and signs of psychosis had ceased.  (T. 257).

On November 12, 2002, Dr. Anderson wrote a letter supporting Plaintiff's application for benefits.  (T. 333).  He stated that he had met with Plaintiff intermittently for the past fifteen months, and diagnosed her with bipolar disorder with generalized anxiety, and panic episodes with agoraphobia, complicated by a variety of personal and family crises.  (T. 333).  He wrote that, in his opinion, Plaintiff was not psychologically able to maintain employment.  He stated that she would not be reliable or consistent in her employment, and that minimal interaction with others would

cause anxiety or panic.  He opined that impulsivity as a function of her occasional mania would impact her employability "depending on the efficacy of her medication."  He indicated that Plaintiff's attempts to work reflected a persistent desire, but not the stability to, maintain employment.  He stated that he agreed with the findings in Dr. Trulsen's consultative report.  (T. 333).

On November 14, 2002, Dr. Anderson saw Plaintiff to help her complete her application for benefits.  Plaintiff reported that her boyfriend had recently assaulted her, she was involved in two lawsuits, and that one of her children had been placed in foster care.  (T. 332).  Dr. Anderson noted that Plaintiff appeared negative, self-deprecating, and lacking in energy.  He opined that she was in the depressive cycle of her bipolar disorder.  (T. 332).

Plaintiff returned to Dr. Anderson on July 24, 2003, after an eight-month hiatus. (T. 316). Plaintiff reported symptoms of anxiety and indicated she wanted to stay more consistent in counseling.  She described herself as easily frustrated, and reported that she tended to isolate herself. Dr. Anderson gave her a score of 50 on the GAF scale, indicating serious symptoms.  (T. 316).

### 2.    Consultative Examination

On August 10, 2002, Martin Trulsen, a licensed psychologist, examined Plaintiff at the request of the Social Security Administration.  (T. 250-52).  Plaintiff told Dr. Trulsen that she suffered bipolar disorder since childhood, and that he also suffered post-traumatic stress disorder. (T. 250).  She stated that she suffered panic attacks approximately five times a week and could not go anywhere alone. (T. 250).  At the time, Plaintiff reported taking Effexor, Depakote, and Klonopi for assistance with mood and behavior.  (T. 251).  She stated that counseling and prescription medications helped "some." (T. 250).  Dr. Trulsen diagnosed Plaintiff as suffering panic disorder

with agoraphobia, bi-polar disorder, and chronic post-traumatic stress disorder.  (T. 252).

Dr. Trulsen indicated that Plaintiff's long-standing bi-polar disorder had resulted in poor personal and financial decisions.  (T. 252).  He indicated that the panic disorder with agoraphobia negatively impacted her ability to function at a level of independence commensurate with her age and ability.  He noted that she appeared "to make regular efforts to minimize the impact of these disorders by her use of psychiatric, psychological, and family support systems."  (T. 252).  He opined, based on her employment history and current functioning, that appropriate employment options appeared possible, but noted that she required some limitations in returning to her previous occupational level until the agoraphobia symptoms were reduced or resolved.  He concluded she was capable of alternative employment, with minimized need for significant concentration skills, if given supportive supervision with clearly defined regular responsibilities.  (T. 252).  He gave Plaintiff a GAF score of 60, indicating moderate to mild symptoms.

### 3.    Plaintiff's Pregnancy

Plaintiff became pregnant around the end of September 2003.  (T. 378-79).  A physical examination related to her pregnancy on January 20, 2004, indicated that she had stopped taking at least two of her psychotropic medications (Depakote and Zyprexa).  (T. 335).

### C.    Plaintiff's Testimony

Plaintiff testified regarding her impairments and conditions at the administrative hearing on February 9, 2004.  (T. 32-57).  She stated that she lived with her three children, and acted as their primary care-giver.  She cleaned and cooked, and cared for her personal needs such as dressing and bathing.  (T. 45-47).  She stated that she had a driver's license and drove approximately once a week to doctors' appointments or the grocery store.  She stated that she did not like to drive or go

anywhere alone.  She stated that she has left the grocery store halfway through her shopping because she becomes afraid.  (T. 55).  She stated that she did not like meeting people and did not like giving information about herself.  (T. 52).

Plaintiff stated that she worked previously as an assembly worker for three weeks, but quit because she didn't like her co-workers.  (T. 48-49).  She stated that she last worked in March 2002 when she was employed as a personal care attendant for a quadriplegic in her own home, eight hours a day, seven days a week.  (T. 35-36).  She stated that she quit that position because she could no longer perform the heavy lifting required after her boyfriend moved out.  She testified that she had not sought further employment on the advice of Dr. Anderson and because she has difficulty being around other people.  (T. 40).

She stated that the paranoias and anxiety attacks worsen when she's around others.  She stated that during a panic attack she feels as if her heart will explode, and that she gets shaky, and sweaty and cries.  She stated that she last suffered a panic attack in 2003 during the foreclosure of her house.  Plaintiff testified that she suffers depressive periods.  (T. 50).  During her last depressive episode during the foreclosure, Plaintiff stated that she stayed awake for three days and then slept for four or five days.  (T. 51).  Plaintiff stated that she also suffered manic episodes that are usually characterized by shopping sprees in which she writes bad checks or obtain loans.  (T. 54).  During a manic phase, she stated that she typically eats a lot, and during a depressive phase, she typically eats nothing.

Plaintiff stated that she enjoys fishing, but has no friends.  (T. 46-47).  She stated that she sometimes watches television, but that she has a hard time concentrating for more than half an hour. (T. 53).

Plaintiff testified that she was taking no medications at the time of the hearing because she was pregnant. (T. 70). She stated that the last time she took psychotropic medication was in June or July 2003. (T. 71). She stated that she quit taking medications during the foreclosure because they made her tired and she "needed to get stuff done." (T. 72).

### D.    Testimony of Plaintiff's Daughter, Angie Redner

Angie Redner, Plaintiff's daughter, testified regarding her mother's impairments at the administrative hearing. She stated that her mother cycled between manic and depressive phases. (T. 58-59). She stated that sometimes her mother was in a good mood and would spend time with her children, and that other times she spent the day in bed and was non-conversant. (T. 58-59). She stated that her mother had been paranoid as long as she could remember and always thought someone was watching her. She testified that her mother often expressed feelings of worthlessness and apologized for her condition. (T. 69).

### E.    Medical Expert Testimony

Mary Stevens, psychologist, testified at the hearing as an impartial medical expert ("ME"). (T. 70-89). The ME stated that the evidence and Plaintiff's behavior supported the diagnosis of bipolar disorder. (T. 77, 85-86). The ME questioned Plaintiff extensively regarding her use of medications. (T. 73-75). The ME testified that there was little documentation showing that Plaintiff had been compliant with her medication, other than for a period in 2002. She stated that the records showed that the Plaintiff had not taken her medications for more than a year prior to May 2002, and that the latest psychiatric contact was in 2001. (T. 79). The evidence also showed that when Plaintiff did take her medications, she was able to work. (T. 77). The ME stated that it may or may not be appropriate for a bipolar patient to continue taking medication during pregnancy. (T. 78).

-10-

She opined that, if Plaintiff was compliant with her medications, she would be capable of simple, repetitive, unskilled work duties in an environment that required only brief and superficial contact with others, with low production standards and only moderate stress.

### F.      Vocational Expert Testimony

Edward Utities testified as a neutral vocational expert ("VE") at the hearing.  (T. 90-95). The ALJ posed a hypothetical to the VE.  The ALJ asked him to assume that the Plaintiff was limited to jobs that required lifting 50 pounds occasionally and 25 pounds frequently, and standing, walking, or sitting for six of eight hours.  The ALJ also limited Plaintiff to unskilled jobs that consisted of simple, repetitive tasks, that required only brief and superficial contact with the public, co-employees and supervisors.  The ALJ further limited Plaintiff to jobs with moderate stress and low production standards.  (T. 92).

The VE opined that Plaintiff would not be able to return to her past relevant employment, but that there was a significant number of jobs in the regional economy that a person of Plaintiff's abilities and limitations could perform, including a variety of cleaning positions (more than 6000 in the regional economy) and machine operator (more than 2900 jobs regionally).  (T. 92-93).

### G.      The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ followed the five-step sequential process outlines in 20 C.F.R. § 404.920.  In the first step of the analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity at any time relevant to the adjudication.  (T. 26).

In the second step of the evaluation process, the ALJ determined whether Plaintiff suffers a severe physical impairment.  A severe impairment is defined as one that significantly limits the

individual's physical or mental ability to meet the basic demands of work activity.  20 C.F.R. §§ 416.920(c); 416.921.  The ALJ found Plaintiff severely impaired by scoliosis, bipolar disorder, anxiety disorder, and osteoarthritis of the hands.  (T. 18).

In the third step, the ALJ compared Plaintiff's severe impairments with the Listing of Impairments in Appendix 1 to Subpart P of the regulations.  (T. 18); 20 C.F.R. § 416.920(d). According to the regulations, if the required level of conditions is met, the claimant is found to be disabled without consideration of vocational factors.  The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that are medically equivalent to those in the Listing of Impairments.  (T. 18).

At the fourth and fifth steps in the evaluative process, the ALJ determined whether Plaintiff's RFC permits her to perform her past relevant work or any other work existing in significant numbers in the national economy.  The term "RFC" is defined as the extent of a person's ability after consideration of the effects of physical and mental limitations that affect the ability to perform work-related tasks.  20 C.F.R. §§ 404.1545 and 416.945; Social Security Ruling 96-8p.  The ALJ determined that Plaintiff had the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently; stand, walk or sit 6 hours of an 8 hour day; and perform simple, repetitive and unskilled work, with brief and superficial contacts, low production standards and moderate stress.  (T. 24; 26).

The ALJ found that Plaintiff could not perform her past relevant work, but that she had the RFC to perform other work which existed in significant numbers in the national economy.  As a result, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act.

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of

whether the decision is supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 729 (8th Cir. 2003); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998). Substantial evidence is less than a preponderance and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998). In determining whether evidence is substantial, a court must also consider whatever is in the record that detracts from the Commissioner's decision. Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004); see also Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence might support a different conclusion. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000); Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996). Therefore, this Court's review of the ALJ's factual determinations is deferential, and the Court may not substitute its own view of the evidence for that of the Commissioner. Kelley v. Barnhart, 372 F.3d 958, 960 (8th Cir. 2004).

## IV.  CONCLUSIONS OF LAW

### A.      The ALJ Reasonably Weighed the Medical Evidence and Testimony

Plaintiff argues that the ALJ did not properly weigh the medical evidence in reaching his decision. See Pl. Mem. pp. 12-16. In particular, she contends that the ALJ gave too little weight to the opinion of her treating psychologist and too much weight to the opinion of the consultative psychologist who testified at the administrative hearing.

Under the Social Security regulations, an ALJ considers the following factors in deciding what weight to give a particular medical opinion: (1) the examining relationship; (2) the treatment

relationship, considering the length, nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical evidence; (4) to what extent the opinion is consistent with the record as a whole; and (5) whether the opinion is that of a specialist on issues relating to his or her specialty. 20 C.F.R. §§ 404.1527(d)(1)-(5); 416.927(d)(1)-(5). Generally, the opinions of doctors who do not examine the plaintiff do not ordinarily constitute substantial evidence to support a finding of non-disability. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). The ALJ is required to give more weight to the opinion of a treating source versus a non-treating source. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). A treating specialist's opinion on the nature and severity of a claimant's impairments will be given controlling weight only when it is well supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence of record. See Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002).

The ALJ may give special weight only to a practitioner's medical judgment about the nature and severity of a claimant's impairments. 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2). If a medical practitioner expresses an opinion on an issue that is reserved to the Commissioner, such as the claimant's RFC, whether a claimant is disabled, or whether the claimant meets a Listing, the ALJ must consider the opinion, but Social Security regulations expressly bar him from giving any special significance to the source of the opinion, and it is never entitled to controlling weight. 20 C.F.R. §§ 404.1527(e)(3); SSR 96-5p. Thus, a "medical source opinion that an applicant is...'unable to work' is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); see also Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004).

Plaintiff contends that the ALJ should have accepted the opinion of Dr. Anderson that she

was incapable of maintaining employment, and should not have accepted the ME's opinion that she was capable of employment. See Pl. Mem. pp. 12-13. The Court disagrees and finds that the ALJ reasonably weighed the medical evidence and opinions.

First, the ALJ was not required to give special weight to Dr. Anderson's opinion that Plaintiff was unable to maintain employment because the determination of whether a plaintiff is capable of employment is an issue reserved to the Commissioner. See Ellis, 392 F.3d at 994. The ALJ was also entitled to give less weight to the opinion of Dr. Anderson because Dr. Anderson's opinion letter was internally inconsistent. Internally inconsistent opinions are entitled to less deference. See Guillams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005). Though Dr. Anderson opined that Plaintiff could not maintain employment, he also stated that he agreed with the conclusions of Dr. Trulsen, the consultative examiner. (T. 333). Dr. Trulsen, like Dr. Stevens, concluded Plaintiff appeared able to engage in work with clearly defined and regular responsibilities, and with minimal need for significant concentration skills. (T. 252).

The ALJ was not required to adopt Dr. Anderson's opinion that Plaintiff was incapable of employment, and the Court finds that the ALJ properly weighed the evidence and satisfied his duty to explain why he reached the conclusion that Plaintiff's impairments were not of disabling severity. The ALJ's decision resolving the conflicting medical testimony is supported by substantial evidence taken from the record as a whole. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2000) (affirming ALJ's decision to discredit one treating physician's opinion that impairments prevented claimant from attaining and retaining employment); Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995) (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

-15-

The ALJ explained that an assertion that Plaintiff could not perform any work activity was inconsistent with both the medical evidence and the overall evidence of record.  (T. 19, 24).  The ALJ acknowledged that Plaintiff had a significant history of mental health issues, but noted the lack of treatment notes regarding Plaintiff's mental health treatment.  (T. 24).  The ALJ also observed that Plaintiff herself testified that her mental health had improved.  Dr. Anderson's opinion that Plaintiff could not work was written in November 2002.  Plaintiff testified that she had not had an episode of severe depression since mid-2003 -- more than eight months before the administrative hearing -- during the foreclosure on her house.  (T. 24).  Plaintiff also conceded that she had not experienced a panic attack for some time.  (T. 40).

The ALJ noted that the evidence suggested that Plaintiff did not follow through with her recommended mental health treatment.  (T. 24).  Though Plaintiff's pregnancy may have prevented her from continuing the use of psychotropic drugs, the record establishes that she stopped taking her medication some months before she became pregnant.  Moreover, the record is replete with evidence that Plaintiff had a history of noncompliance with medications, beginning in 1999.  Her psychiatrist, Dr. Saracino, stopped seeing Plaintiff and refused to prescribe medication because she had missed so many appointments.  (T. 231, 234, 236).  The ALJ found that Plaintiff had previously sustained gainful employment while she was taking her medications.  (T. 25).  He also noted that even during times when Plaintiff's compliance with medical treatment was in question, she still had the capacity to manage multiple significant crises that affected her family.  (T. 25).

In addition, the ALJ observed that Plaintiff sought counseling only intermittently.  (T. 21, 23, 24).  He noted the ME's testimony that the evidence demonstrated noncompliance with both medications and counseling appointments, but that Plaintiff appeared capable of working when she

-16-

was taking her medications.  (T. 23; 25, citing T.  77-79).  The ME testified that counseling and medication are vital for patients with bipolar disorder.  (T. 84).  Plaintiff herself reported to her physician at Gateway Family Health Clinic in May 2002 that Lithium stabilized her mood and that Benzodiazepines helped her social phobia and agitation.  (T. 264).  She reported to consultative examiner Dr. Trulsen in August 2002 that she received some benefit from counseling and prescription medications.  (T. 250).  The ALJ reasonably concluded, based on the record, that Plaintiff's impairments that were amenable to treatment, and that she failed to follow through with her recommended treatment.  See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (impairments that are controllable or amenable to treatment do not support a finding of total disability); Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (failure to follow a prescribed course of remedial treatment without good cause is grounds for denying an application of benefits).

The ALJ also observed that even during times when Plaintiff's noncompliance with her medications was questionable, she remained capable of driving, terminating an abusive relationship, caring for her children, and engaging in activities with her family like ice fishing.  (T. 23).

The ALJ's decision resolving the conflicting medical evidence and testimony is supported by substantial evidence taken from the record as a whole.  The ALJ found the severity of Plaintiff's complaints were inconsistent with her daily activities, her treatment history, and the ME's testimony. Because Dr. Stevens was a medical expert giving testimony in her area of specialization, the ALJ was entitled to give weight to her opinion in reaching his decision.  20 C.F.R. §§ 404.1527(d); 416.927(d).  Moreover, Dr. Stevens' opinion on Plaintiff's ability to engage in work-related activity was fully consistent with the opinion of Dr. Trulsen, the consultative psychological examiner, who opined that Plaintiff appeared able to engage in work with clearly defined and regular

responsibilities, and with minimal need for significant concentration skills.  The ALJ did not error by giving less weight to the opinion of Dr. Anderson that Plaintiff was incapable of employment. Because substantial evidence supports the ALJ's opinion that Plaintiff is able to engage in substantial gainful activity, his decision should be upheld.

### 1.     Social Security Regulation 82-59 Is Inapplicable

Plaintiff argues that the ALJ erred in crediting the testimony of the ME because the ME failed to address the four criteria of Social Security Regulation 82-59.  Under SSR 82-59, the Agency may determine that a claimant has failed to follow prescribed treatment where (1) the evidence establishes that the claimant's impairment precludes any substantial gainful activity; (2) the impairment is expected to last for twelve continuous months or result in death; (3) a treating source has prescribed treatment that is clearly expected to restore the capacity to engage in substantial gainful activity; and (4) the evidence shows that the claimant has refused to follow the treatment.  Thus, SSR 82-59 sets forth the criteria an ALJ must follow in assessing a claimant's failure to follow prescribed treatment as part of the disability determination.  SSR 82-59 does not pertain to the ME's testimony, and it does not restrict the use of evidence of noncompliance at the administrative hearing.  Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  Determining disability and interpreting social security regulations is not the medical expert's role.  20 C.F.R. §§ 404.1527(a)(2).  Thus, the ALJ was not required to discredit the ME's testimony for the failure to comply with SSR 82-59.

Moreover, SSR 82-59 only applies to claimants who would otherwise be disabled within the meaning of the Act.  It explains the circumstances in which the Commissioner may deny benefits to an otherwise disabled individual on the basis that she has failed to follow the prescribed

treatment. <u>Holley</u>, 253 F.3d at 1092. In this case, the ALJ noted that Plaintiff had proved capable of working when she was on her medications, but also concluded that even during times of questionable compliance with medical treatment, she was still able to manage significant crises affecting her family, provide stability for her children despite a chaotic family situation, meet and become involved in a long-term relationship, and dissolve that relationship when her partner proved abusive. (T. 25). Because the ALJ determined that Plaintiff was not disabled within the meaning of the Act, SSR 82-59 does not apply.

### B. The ALJ Appropriately Addressed Plaintiff's Non-Exertional Impairments

Plaintiff argues that the ALJ's hypothetical to the VE was defective because it did not fully describe her impairments as found by Dr. Anderson. (Pl. Mem. pp. 16). As discussed above, however, the ALJ reasonably relied on the testimony of the ME. The ALJ included the mental limitations found by the ME into the hypothetical he posed to the VE, and incorporated those limitations into his decision regarding Plaintiff's RFC. (Tr. 24; 92). Because the ALJ's hypothetical question accurately incorporated all the limitations that the ALJ accepted as true, the VE's testimony constituted substantial evidence supporting the ALJ's opinion. <u>Newton v. Chater</u>, 92 F.3d 688, 694-95 (8th Cir. 1996).

### V. RECOMMENDATION

Based on all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment [#8] be **DENIED**;

2. Defendant's Motion for Summary Judgment [#11] be **GRANTED**.

DATED: February 3, 2006                    s/ *Franklin L. Noel*
                                            FRANKLIN L. NOEL

-19-

United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 17, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.